**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
---------------------------------------------------------------X

UNITED STATES OF AMERICA,

    -against-

DYLAN MEISSNER

                       Defendant.
---------------------------------------------------------------X

Docket No. 3:24-cr-00151

## DEFENDANT'S PRE-SENTENCE MEMORANDUM

MINTZ & GOLD, LLP
Roger L. Stavis, Esq.
Victoria Muth, Esq.
600 Third Avenue, 25th Floor
New York, NY 10016
Tel: (212) 696-4848
Stavis@mintzandgold.com
Muth@mintzandgold.com

*Attorneys for Defendant*

**INTRODUCTION**

This Pre-Sentence Memorandum is submitted in advance of the upcoming sentencing of our client, DYLAN MEISSNER. It addresses the legal and factual issues pursuant to 18 U.S.C. § 3553 and the U.S. Sentencing Guidelines, which we believe warrant a sentence below the applicable Guidelines range.

**THE PRE-SENTENCE REPORT AND SENTENCING GUIDELINES ISSUES**

Dylan Meissner pled guilty to one count of wire fraud pursuant to a Plea Agreement dated July 18, 2024 ("Plea Agreement"). Pursuant to that agreement, the parties specifically reserved as a legal issue for this Court's determination whether an additional two-point enhancement was warranted for "substantial hardship to one or more victims" pursuant to USSG § 2B1.1(b)(2)(A)(iii) (see Plea Agreement, p. 3-5).[1]

<u>Substantial Financial Hardship Under § 2B1.1</u>

The defense contests a two-point enhancement for "substantial financial hardship" under USSG § 2B1.1 (PSR ¶ 27). Sentencing Guidelines § 2B1.1(b)(2)(A)(iii) provides for a two-level increase in the offense level if the offense resulted in "substantial financial hardship" to "one or more victims." "Victim" means "any *person* who sustained any part of the actual loss determined under subsection (b)(1)." USSG § 2B1.1, cmt. n. 1. While the definition of "'[p]erson' includes individuals, corporations, [and] companies," <u>id.</u>, it is apparent from the types of harms referenced

---

[1] If the offense is found by this Court to have resulted in "substantial financial hardship to one or more victims" under USSG § 2B1.1(b)(2)(A)(iii), this will preclude Mr. Meissner from receiving the two-point reduction as a "zero-point offender" under USSG § 4C1.1(a)(6). This enhancement, in effect, results in a four-point swing in the ultimate offense level. See Plea Agreement, p. 5, ¶¶ 1-3. Because the "substantial financial harm" enhancement is not intended to apply to corporate victims, Mr. Meissner ought to receive the two-point reduction as a zero-point offender.

1

that this **very** consequential enhancement (resulting in a four-point swing because it precludes the "zero offender" provision) was intended for individual, rather than corporate, victims.

The application notes provide a list of factors reflecting the non-corporate nature of this provision. Application Note 4(F) provides:

> In determining whether the offense resulted in substantial financial hardship to the victim, the court shall consider, among other factors, whether the offense resulted in the victim
>
> (i) becoming insolvent;
> (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);
> (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;
> (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;
> (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and
> (vi) suffering substantial harm to his or her ability to obtain credit.

USSG § 2B1.1 Application Note 4(F).

It appears from the examples listed in Application Note 4(F)—e.g., living arrangements, education, employment, credit, and relocation—that this provision was intended to apply to individuals rather than corporations like Delphi. Significantly, neither the Second Circuit, nor the United States District Court for Connecticut, have applied the "substantial financial hardship" enhancement in criminal prosecutions where the victim is a corporation rather than an individual victim. Cf. U.S. v. Jaramillo, 754 Fed.Appx. 61 (2d Cir. 2019) (applying the substantial financial hardship enhancement to where the defendant's criminal conduct had a "profoundly devastating impact" on individual unsophisticated immigrant investors); U.S. v. Swartz, 758 Fed.Appx. 108 (2d Cir. 2018) (applying the substantial financial hardship enhancement to individual victims, and not a corporate victim); U.S. v. MacCallum, 2018 WL 2999907, at *11-12 (W.D.N.Y. June 15, 2018) (holding that that the substantial financial hardship enhancement applied where, as a result

2

of the defendant's fraud, one victim had to delay her retirement and two victims suffered losses to their entire life insurance policies and annuities). The Probation Department and the Government are asking this Court to blaze a new path in the law by applying this provision (which has the harsh effect of precluding a reduction as a zero-point offender) to a corporate victim. We would urge the Court not to do so.[2]

**STRICT APPLICATION OF THE GUIDELINES TO MR. MEISSNER WILL RESULT IN AN UNREASONABLE SENTENCE**

In the event that this Court disagrees with The Pre-Sentence Report regarding the "sophisticated means" enhancement and also disagrees with our legal analysis that the "substantial financial harm" enhancement should not apply to corporate victims (and its concomitant preclusion of the "zero-offender" reduction), the resulting sentence will overstate the magnitude of Mr.

---

[2] While this was the sole legal issue reserved for this Court's determination, the defense having stipulated to the applicability of the "sophisticated means" enhancement, the Plea Agreement specifically provided that if the Probation Department "contemplates any sentencing calculations different from those stipulated by the parties," then the parties are permitted "to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations." Plea Agreement at p. 5, ¶ 7. The Probation Department has correctly rejected the "sophisticated means" enhancement. As noted in PSR paragraph 28, Mr. Meissner "was not a 'sophisticated trader'," was struggling with substance abuse, and was "not making rational decisions" at the time of his course of criminal conduct. To the contrary, his conduct was hardly "especially complex or especially intricate." See USSG § 2B1.1 Application Note 9(B).

The Probation Report is undoubtedly correct in rejecting this enhancement. District courts have held that mere fraud cases that do not involve the use fictitious entities, corporate shells, or offshore financial accounts are not "sophisticated" as contemplated by the Guidelines. See U.S. v. Executive Recycling, Inc., 953 F.Supp.2d 1138, 1167-68 (D. Colo. 2013) (sophisticated means enhancement not triggered, especially where "there was no evidence of hidden transactions, false entities, corporate shenanigans, or offshore financials"); U.S. v. Garcia, 939 F.Supp.2d 1155, 1215 (D.N.M. 2013) (holding that defendant's creation of false invoices to conceal his scheme of misappropriating loan funds was not sophisticated, because defendant did "not seem to have done so in a particularly sophisticated fashion that made detection of the offense difficult," and because the defendant did not use "fictitious entities, corporate shells, or offshore financial accounts" to commit the fraud); U.S. v. Brown, 877 F.Supp.2d 736 (D. Minn. 2012) (sophisticated means enhancement in wire fraud case not warranted, because even though defendant opened separate bank accounts at two banks, solicited funds from victims in multiple states, and forged documents to orchestrate a fraud scheme, defendant "did not create fictitious entities, corporate shells, or offshore financial accounts"). Accordingly, we urge this Court to agree with the Probation Report and reject the "sophisticated means" enhancement.

3

Meissner's crime and take it outside the "heartland" envisioned by the Guidelines. See USSG Ch. One, Pt. A, Subpt. 1 ("The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes.").

The Supreme Court explained in Rita v. U.S., 551 U.S. 338, 347-48 (2007) that a district court should begin all sentencing proceedings by correctly calculating the Guidelines range. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. U.S., 552 U.S. 38, 49 (2007). However, "the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." Id. at 49-50.

In light of the manner in which the "sophisticated means" and "substantial financial harm" provisions, combined with preclusion of the "zero offender" reduction, greatly elevate the Guidelines' sentence, and because of the unique circumstances of this offender, a Guideline sentence would fall outside the "heartland." After consideration of the Sentencing Guidelines, this Court is required to consider, pursuant to 18 U.S.C. § 3553(a)(1), "the nature and circumstances of the offense and the history and characteristics of the defendant."

Evaluating the "nature and circumstances of the offense" in Mr. Meissner's case, it is due primarily to an 18-level increase under USSG § 2B1.1(b)(1)(J)—based on a financial loss calculation of approximately $4,461,828.24 (PSR at ¶ 26)—that the Sentencing Guidelines provide for a sentence of between 51 to 63 months' and 78 to 97 months' imprisonment. See Plea Agreement, p. 5, ¶¶ 2-3.[3] But although the intended loss amount must be used for the purposes of

---

[3] Under the Government's calculations, a total offense level of 28 would result in a Guideline range of 78 to 97 months of imprisonment. Under the defendant's calculation, a total offense level of 24 would result in a Guideline range of 51 to 63 months.

4

correctly calculating the Sentencing Guidelines range, the Court must weigh the section 3553(a) factors to arrive at an independently "reasonable" sentence based on an "individualized application of the statutory sentencing factors" in § 3553. U.S. v. Dorvee, 616 F.3d 174, 184 (2d Cir. 2010) (citing Gall v. U.S., 552 U.S. 38, 46-47 (2007)).

For two decades, district courts in this Circuit have been critical of the "questionable" financial loss factor for the ultimate determination of precisely how much time an offender spends in prison. See U.S. v. Emmenegger, 329 F.Supp.2d 416, 427 (S.D.N.Y. 2004). In Emmenegger, the court identified the problems with this Guideline: "the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; the lack of any consideration of danger to society; and so on." U.S. v. Johnson, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (citing Emmenegger, 329 F.Supp.2d at 427-28). Similarly, another district court in this Circuit held: "This case represents another example where the guidelines in a securities-fraud prosecution 'have so run amok that they are patently absurd on their face' […] due to the 'kind of piling on of points for which the guidelines have frequently been criticized.'" U.S. v. Parris, 573 F.Supp.2d 744, 745 (E.D.N.Y 2008) (internal citation and quotation marks omitted), quoting U.S. v. Adelson, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006) (commenting on the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); see also U.S. v. Gupta, 904 F.Supp.2d 349, 351 (S.D.N.Y. 2012) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."); USSG § 2B1.1, Application Note 21(a) ("There may

5

be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.").

Increasingly, courts have skeptically viewed such large increases in sentences based almost solely on the single factor of financial loss. In U.S. v. Corsey, 723 F.3d 366 (2d Cir. 2013), Judge Underhill (U.S. District Court for the District of Connecticut, sitting by designation) emphasized in his concurrence the substantive unreasonableness this factor presents: "The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb…The higher the loss amount the more distorted is the guideline's advice to sentencing judges." Id. at 380 (Underhill, J., concurring). More recently, in U.S. v. Johnson, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018), the court noted: "As far as this court can tell, the Sentencing Commission's loss-enhancement numbers don't result from any reasoned determination of how the punishment can best fit the crime, nor an approximation of the moral seriousness of the crime." Id. at *3 (citing Corsey, 723 F.3d at 380 [Underhill, J., concurring]).

In this case, the magnitude of the financial loss was unusual in that it was primarily motivated by an underlying pathology, rather than an overwhelming desire to live a "lavish lifestyle" (see PSR ¶¶ 23, 117). ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪ As discussed in more detail below, Mr. Meissner has devoted his energies to atoning for his criminal conduct, which is antithetical to his character

6

and the values he has otherwise exhibited during the course of his life.[4] Mr. Meissner's crimes, which are "the very antithesis of the values he had previously embodied," should "warrant a non-guideline sentence, even aside from the other factors favoring leniency." Gupta, 904 F.Supp.2d at 354. Indeed, this "single factor as the basis for enhanced punishment"—the amount of monetary loss caused by the offense—must be considered against the many factors outlined in 18 U.S.C. § 3553." Id. at 351.

## THE SECTION 3553 FACTORS AS APPLIED TO DYLAN MEISSNER

### The Legal Standard

In U.S. v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory aspects of the Sentencing Guidelines were unconstitutional. District courts must still "consider" the sentencing factors set forth in 18 U.S.C. §3553(a), though "robotic incantations" of the § 3553(a) factors are not required. U.S. v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[W]e will not prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to 'consider' the Guidelines."), abrogated on other grounds by U.S. v. Fagans, 406 F.3d 138 (2d Cir. 2005). The ultimate sentence, however, must be based upon the factors enumerated in § 3553(a). See U.S. v. Pereira, 465 F.3d 515, 523 (2d Cir. 2006) ("a district court must 'consider' the factors listed in § 3553(a) in order for the sentence it imposes to be reasonable").

As the Supreme Court held in Gall v. U.S., 552 U.S. 38 (2007), there is no presumption of unreasonableness when a sentence falls outside the Guidelines range, provided the district court properly considered the § 3553(a) factors. See id. at 47 ("[T]he approaches we reject come too

---

[4] Mr. Meissner has wasted no time ensuring that he begins to long and arduous process of paying restitution to Delphi. At the time of Mr. Meissner's departure from Delphi, he owned shares in a Delphi venture fund. Mr. Meissner has already executed the relevant documents prepared by Delphi's counsel which result in a liquidation of the value of his shares and repayment to Delphi of the sum of $69,608.00 (PSR ¶ 77).

7

close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range."). In fact, the Supreme Court's analysis in Gall rejected the premise that a district court may rely on the presumption that a Guidelines sentence is reasonable. Id. at 50 ("[a sentencing judge] may not presume that the Guidelines range is reasonable"). Instead, in applying the § 3553(a) factors, the sentencing judge:

> Must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

Id.

The Second Circuit has also noted the broad discretion district courts have in imposing a downward variance from the Guidelines range, so long as the court sufficiently justifies the basis for, and extent of, the variance. See U.S. v. Stewart, 590 F.3d 93, 135 (2d Cir. 2009) ("District courts are generally free to impose sentences outside the recommended Guidelines range but must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance") (citation and internal quotation marks omitted); U.S. v. Cavera, 550 F.3d 180, 188 (2d. Cir. 2008) (en banc) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime.").

The basic principle is that the length of the sentence this Court imposes on Dylan Meissner must be "reasonable" in light of the factors enumerated in 18 U.S.C. § 3553(a). See Cavera, 550 F.3d at 189-190 (2d Cir. 2008); U.S. v. Verkhoglyad, 516 F.3d 122, 127 (2d Cir. 2008). Those factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, afford adequate deterrence, and protect the public; and provide the defendant with needed training or medical care. 18 U.S.C. § 3553(a)(1), (2).

For the reasons argued below, a reasonable sentence, "sufficient, but not greater than necessary" to fulfill the policy objectives of § 3553(a), should be a sentence below the Guidelines' range.





### Letters Submitted to the Court

We have provided this Court with a series of letters from those who know Dylan Meissner best, for the purpose of amplifying the attributes of character which we urge this Court to consider in fashioning an appropriate sentence. First, to an extraordinary degree, Dylan Meissner is the glue that holds his friends and family together. He is a devoted son, a loyal friend, and a leader in the eyes of all those closest to him, especially those struggling with addiction. Second, it is plain from these letters that Mr. Meissner is undoubtedly a "hard-working and disciplined young man" (Exh. B [Letter of ▌]). Indeed, according to his childhood friend ▌, Mr. Meissner is "one of the hardest working people" ▌ knows (Ex. C [Letter of ▌]). For example, Dylan obtained his master's degree in just five years, passed his CPA exams on his first attempt, and immediately got a prestigious job right out of college (Exh. D [Letter of ▌]; Exh. C [Letter of ▌]; Exh. B [Letter of ▌]). The compelling letters from his friends and family (Exhibits B - K attached herein) serve as a powerful

testament to the "characteristics of the defendant." 18 U.S.C. § 3553(a).

### Overcoming Mental Health and Substance Abuse Struggles to Become a Leader in Addiction Recovery

With that background, it is not surprising that Mr. Meissner has worked hard to obtain sobriety and has been a leader in others' journey to recovery. But to better understand Mr. Meissner's addiction and recovery, it is crucial to look back at his adolescence. ▮

▮

▮

▮

▮

▮

▮

▮

▮

▮

▮

▮

▮

11

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████

Both the PSR ████████████████████ detail Mr. Meissner's history with substance abuse, which culminated in February 2022 and endured through the offense conduct until Mr. Meissner's termination from Delphi in November 2022 ███████████████████ ███████ PSR ¶¶ 55-60). ██████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

████ A large motivating factor to Mr. Meissner's addiction was that he "wanted to maintain that 'nothing was wrong,'" believing that he could on his own pull himself out of the financial hole he dug (PSR ¶ 59).

Ultimately, Mr. Meissner admitted both to himself and to Delphi that he was a drug addict who had betrayed the company through his large-scale embezzlement. He assisted Delphi in preparing a spread sheet to assess the damage he had caused the company ████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████

In an effort to continue maintaining his sobriety, find healthy coping mechanisms for his emotional distress, and support others, Mr. Meissner has joined a White Collar Support Group, which meets two times per week (see PSR ¶ 5). This group consists of individuals who have been convicted of white-collar crimes, and whose cases are in a pre- or post-sentencing posture. The purpose of this group is to provide guidance and support to its participants throughout their journey through the criminal justice system. ████████████████████████████████



### The Devoted Son

To understand "the values [Mr. Meissner] has displayed his entire life," we must start with his parents, ▇▇ and ▇▇ Meissner. ▇▇▇▇ describes how his son has always shown "intellect, curiosity, toughness," and a "sensitive side that endears him to friends and family" (Exh. F [Letter of ▇▇▇]). Throughout his childhood, Mr. Meissner was a responsible and trustworthy child. His mother describes, for example, how as a child, if she left Mr. Meissner money or a credit card while she was at work, he would "only spend what was intended" and "return the change" (Exh. D [Letter of ▇▇▇]). Mr. Meissner always helped at home "with shopping and cooking meals," and frequently was a welcomed guest in his friends' homes because he "was kind" and "helped out" (Exh. D [Letter of ▇▇▇]; see also Exh. B [Letter of ▇▇▇]). Indeed, ▇▇▇, a family friend who has known Mr. Meissner for over 25 years, recounts how "[f]rom a very young age, Dylan carried himself with a maturity and thoughtfulness," evidenced by his desire to help others and contribute to family gatherings (Exh. J [Letter of ▇▇▇]).

14

[REDACTED]

### The Loyal Friend

Mr. Meissner is a "loyal and compassionate friend," exemplified by his "caring and empathetic" support of his lifelong friends (Exh. B [Letter of ▬▬▬]; see also Exh. D [Letter of ▬▬▬] [describing how Mr. Meissner has "kept many friendships" throughout his life]). Growing up, Mr. Meissner "never wanted anyone to be excluded" and stood up for other kids "being unfairly targeted at school" (Exh. F [Letter of ▬▬▬]). ▬▬▬ provides three specific examples of Mr. Meissner's "kindness and empathy towards others" (Exh. D [Letter of ▬▬▬]). On one occasion, Mr. Meissner volunteered to mentor a fellow student with developmental delays in math. Mr. Meissner's kindness had an impact on both this student and the student's mother (Exh. D [Letter of ▬▬▬]). On a separate occasion, Mr. Meissner was at a sleepaway camp, and a boy who slept next to him in his bunk was homesick. "If it were not for Dylan," who by all accounts "gave this boy incredible support, friendship, and kindness," the boy would have left the camp "within the first week," but ended up "staying the whole summer" (Exh. D [Letter of ▬▬▬]). And, during a specific football game, Mr. Meissner stood up to "bullies" who were targeting another student who was less "athletically inclined" (Exh. D [Letter of ▬▬▬]).

Moreover, Mr. Meissner's long-time friend, ▬▬▬, describes Mr. Meissner as a

15

"role model." ▓▓ writes how Mr. Meissner helped ▓▓ to "excel[ ] academically" and was "instrumental in ▓▓ decision-making during many critical junctions in ▓▓ career" (Exh. E [Letter of ▓▓▓▓]). Two of Mr. Meissner's childhood friends further describe him as "selfless," "thoughtful," "responsible," and "loyal" (Exh. C [Letter of ▓▓▓▓]; Exh. K [Letter of ▓▓▓▓]). ▓▓▓▓, a close friend of Mr. Meissner's since elementary school, even describes Mr. Meissner as the "glue" of the "camaraderie" holding their "group of friends" together for decades (Exh. K [Letter of ▓▓▓▓]).

### Mr. Meissner's Conduct was Antithetical to His Lifelong Values

Having reached rock bottom in his criminal conduct, Mr. Meissner demonstrated his intrinsic motivation and ability to turn his life around and rectify the harm he has caused. He has voluntarily sought out extensive therapy and treatment and has now maintained his sobriety for approximately two years. With these resources, Mr. Meissner has gained the skills to identify and regulate his own cognitive distortions and emotional distress, which will serve as strong protective factors against Mr. Meissner relapsing or recidivating (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Every single friend and family member who has written to the Court in support of Mr. Meissner describes how his course of criminal conduct was so unlike the Dylan Meissner they had come to know. They all emphasize how deeply Mr. Meissner regrets his actions and the harm he has caused to Delphi and its employees. But as Mr. Meissner's father describes, it is evident that he "has the ability and talent to correct past mistakes and make good choices going forward" (Exh. F [Letter of ▓▓▓▓]).

16

**CONCLUSION**

For the reasons stated above, the balance of factors contemplated by 18 U.S.C. § 3553 favor a non-Guidelines sentence. Indeed, the Probation Report at page 26, para. 108 states that this Court may wish to consider a non-Guidelines sentence. In this regard, while it may appear at first blush counter-intuitive, this Court should be aware that no matter what non-Guidelines sentence it deems fair and just, Mr. Meissner's commendable sustained sobriety **renders him ineligible** for the Bureau of Prison's Residential Drug Abuse Program ("RDAP"). As this Court is no doubt aware, RDAP is a nine-month program which provides inmates with an opportunity to engage in cognitive behavioral therapy and participate in half-day programming and half-day work, school, or vocational activities.[5] At the successful completion of the program, inmates may earn a reduction in their sentence. However, because Mr. Meissner has demonstrated a two-year period of sobriety prior to his sentencing, **he is ineligible for the program and the reduction in the term of incarceration which goes along with it.**

In fashioning a section 3553 non-Guideline sentence "sufficient, but not greater than necessary," we ask this Court to consider ▇▇▇▇▇▇▇▇▇▇ and the many letters demonstrating that Dylan Meissner is a lot more than the sum of his criminal conduct. That conduct must be viewed in the context of his addiction and compulsions, as well as the manner in which he has lived his life both before and after his criminal conduct. Throughout his life he has done much good for his family, his friends and his community and if given the opportunity, he can do more good. He is a good person who has committed a serious crime and for that, he is overcome with remorse and regret. See Exhibits A – K.

Dylan Meissner well understands and appreciates the gravity of his criminal course of

---

[5] *Federal Bureau of Prisons Substance Abuse Treatment*, Fed. Bureau of Prisons (Nov. 2024), https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp.

conduct and that the time has now come for him to face a term of incarceration. The question for this Court is how much incarceration is "sufficient but not greater than necessary" in light of the fuller picture painted for the Court of the individual who now stands before the Court for sentencing. While we are confident that whatever sentence this Court chooses to impose will be a fair and just one, we nevertheless respectfully request, in light of all the §3553(a) factors, that this Court impose a sentence of 1 year and 1 day of incarceration.

Dated: New York, New York
December 2, 2024

MINTZ & GOLD, LLP

/s/ Roger Stavis
Roger L. Stavis
Victoria Muth
600 Third Avenue, 25th Floor
New York, New York 10016
Tel: (212) 696-4848
Stavis@mintzandgold.com
Muth@mintzandgold.com

*ATTORNEYS FOR DEFENDANT*

18