UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM NO. 3:24CR151 (MPS) |
| v. | |
| DYLAN MEISSNER | December 10, 2024 |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Over a period of nine months in 2022, Dylan Meissner stole nearly $4.5 million from his employer (referred to in the plea agreement and Information as "Company A") over more than forty transactions, employing a series of four different fraudulent mechanisms, and covering up his theft by falsifying company records and lying to colleagues. The defendant acted not out of some dire financial need, but as part of a scheme to make quick money trading cryptocurrency futures. When his initial personal investment went down in value, and he lost a loan he was given from Company A, he exploited his access to Company A's bank accounts and cryptocurrency wallets to divert company funds to attempt to recompense his losses and make money for himself. When the dust settled, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, among other things. And, while the Court should consider the defendant's history, mental health, and other personal characteristics, those factors should not shield him from accountability for his fraud and the profound impact it had on his colleagues. The Court should, therefore, sentence the defendant to a substantial term of imprisonment commensurate with the seriousness of his crime.

I.  Introduction and Background

   A.  Procedural History

On July 18, 2024, the defendant appeared before United States Magistrate Judge Robert A. Richardson and pleaded guilty to a one-count information charging him with Wire Fraud, in violation of Title 18, United States Code, Section 1343.  The defendant's plea was pursuant to a plea agreement that, among other things, included a Sentencing Guidelines stipulation in which the parties disagreed regarding the proper advisory sentencing range; the Government contended the range should be 78 to 97 months' imprisonment, while the defendant claimed it should be 51 to 63 months' imprisonment.  The defendant also agreed to make restitution in the amount of $4,633,424.99, comprised of $4,461,828.24 in fraud loss and $171,596.75 that Company A loaned to the defendant.

The defendant waived appeal so long as his sentence does not exceed 97 months of imprisonment, a three-year term of supervised release, a $250,000 fine, restitution in any amount ordered by the Court, and a $100 special assessment.

   B.  Summary of the Facts

A fulsome summary of the offense conduct is set out in the PSR at ¶¶ 10-18, which the Government incorporates by reference and substantially restates or summarizes here.

From October 4, 2021, until November 10, 2022, the defendant was the Vice President of Finance for Company A, a subscription-based cryptocurrency research firm.  In that capacity, he was entrusted with access to the company's cryptocurrency wallets and bank accounts.  In or about late January 2022, the defendant obtained a 50 Ethereum (just over $170,000) loan from Company A, with his stated intent to use the funds to avoid a substantial loss in certain cryptocurrency investments the defendant had made using his personal funds.  Shortly following that loan, the

defendant began a fraud scheme to divert more funds from Company A, this time without permission, in further attempt to make up for massive trading losses in his own personal account. He then covered up his diversions through falsifying Company A's books.

Meissner executed the scheme by: (1) diverting to himself payments made to Company A from its affiliate company, while recording the payments in the Company A ledger as actually received; (2) diverting to himself funds intended for Company A analyst bonuses, recording the bonuses as being paid, and providing false reasons to the analysts regarding why they did not get their bonuses; (3) doubling the amount of payment owed to a vendor in Company A's ledger, and then taking half of the payment for himself and remitting the other half to the vendor; and (4) pretending to consolidate smaller Company A cryptocurrency wallets that contained so-called cryptocurrency "dust," but instead taking the funds for himself. In total, the defendant stole approximately $4,461,828.24 from Company A as described above. Including the additional $171,596.75 that Company A loaned him, the defendant caused $4,633,424.99 in losses to Company A. The defendant admitted the fraud to his employer once he was pressed to provide financial information to potential investors and could not hide the missing money.

As described in the PSR, ¶¶ 17-21, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

II.   Sentencing Guidelines

The parties (in the plea agreement) and the Probation Office agree that the base offense level is 7 pursuant to U.S.S.G. § 2B1.1(a)(1); 18 levels are added under § 2B1.1(b)(1)(J) because the loss is more than $3.5 million and less than $9.5 million; and 2 levels are added under § 3B1.3 because he defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense.

There remain two disputed issues—the application of the substantial-financial-hardship enhancement in § 2B1.1(b)(2)(A)(iii), which would also disqualify the defendant for a zero-point offender reduction, and the sophisticated means enhancement in § 2B1.1(b)(10)(C).

A.  Substantial Financial Hardship

The Government believes that the offense level is further increased by two because the offense resulted in substantial financial hardship to Company A.  U.S.S.G. § 2B1.1(b)(2)(A)(iii). The Probation Office agrees, but the defendant disagrees.

Under § 2B1.1(b)(2)(A)(iii), two levels are added "if the offense…resulted in substantial financial hardship to one or more victims."  Application Note 1 states that a "victim" includes "any person who sustained any part of the actual loss determined under subsection (b)(1)," and "'person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." Application Note 4(F) provides a non-exhaustive list of factors to consider when determining whether the offense resulted in substantial financial hardship, including insolvency, bankruptcy, substantial loss of a savings or investment fund, substantial change to employment or living arrangements, or substantial harm to the victim's ability to obtain credit.

The enhancement is legally and factually warranted here. First, while the Second Circuit has not ruled on application of the substantial-financial-hardship enhancement (which is new as of

4

2015) to organizational victims, other courts of appeals have affirmed such application or, at the very least, assumed its application. *See United States v. Aderinoye*, 33 F.4th 751, 757 (5th Cir. 2022) (affirming that that substantial-financial-hardship enhancement applies to corporations, and noting that "[t]o our knowledge, no court has limited the enhancement" to individuals); *United States v. Piper*, Case No. 20-1867, 2021 WL 5088709, at *3 (6th Cir. Nov. 2, 2021) (unpublished) (affirming application of substantial-financial-hardship enhancement to a corporate victim); *United States v. Salman*, 798 F. App'x 342, (11th Cir. 2019) (unpublished) (affirming application of substantial-financial-hardship enhancement to a corporate victim); *United States v. Clayborn*, Case No. 19-1499, 2020 WL 948508, at *1 (6th Cir. Feb. 27, 2020) (unpublished) (applying enhancement for substantial financial hardship in a scheme involving defrauding charitable organizations).

      Determination of substantial financial hardship is a subjective inquiry in which the "sentencing court may … look at the factual record to infer the extent of the financial loss endured by a particular victim." *United States v. Poulson*, 871 F.3d 261, 269 (1st Cir. 2017). "Whether a loss has resulted in substantial hardship will, in most cases, be gauged relative to each victim." *Id*. at 268 (quoting *United States v. Minhas*, 850 F.3d 873, 877-78 (7th Cir. 2017)) (alterations adopted). While the Second Circuit has not defined "substantial" in this context, other circuits have found "that a loss qualifies if it significantly impacts the victim's resources." *Aderinoye*, 33 F.3d at 757. It is a "middle ground," *Poulson*, 871 F.3d at 269, somewhere between a "minimal loss or hardship … and a devastating loss," *Minhas*, 850 F.3d at 878. For example, in *Aderinoye*, the Fifth Circuit approved its application to a victim company where the $102,000 loss "was not ruinous," but set the business back over six months, caused an inability to pay vendors, and caused difficulty making payroll. 33 F.4th at 757.

Here, the factual record, discussed above and in the PSR, and detailed in a Company A's Victim Impact Statement, supports a conclusion that the fraud "significantly impact[ed] the victim's resources," *Aderinoye*, 33 F.3d at 757, and thus the enhancement should apply. ▮

▮▮▮▮▮▮▮

The defendant's principal counterargument—that the substantial-financial-hardship enhancement is confined to individual victims—is unsupported in the Guidelines, commentary, or caselaw. As the defendant concedes, there is nothing in the text of the guideline itself that suggests organizations should be excluded. *See* Def. Mem. at 1 (acknowledging that the Guidelines' definition of "person" includes corporations). Instead, the defendant asks the court to infer this limitation from the non-exhaustive list of factors in the commentary, which includes several items that, in his view, apply only to individuals.

This argument fails first because the list, in fact, includes factors that would also apply to companies, including insolvency, bankruptcy, loss of a savings or investment fund, and ability to obtain credit. ▮ *See* ▮ *Aderinoye*, 33 F.4th at 757 ("[I]nability to pay vendors constitutes temporary insolvency, a factor

the commentary identifies as indicative of substantial financial hardship.").

Second, the list is, on its own terms, non-exhaustive, and courts ought to consider all facts that bear on the question of substantial financial hardship. *See* U.S.S.G. App. C at 104 (referring to Application Note 4(F)'s list of factors that courts consider in assessing "substantial financial hardship" as "non-exhaustive"). Third, while the Second Circuit has not yet spoken on the issue, the defendant points to no other court that has limited the enhancement in the way he proposes, nor does he grapple with the cases that have applied the enhancement to organizational victims. And fourth, far from asking the Court to "blaze a new path in the law," as the defendant claims (Def. Mem. at 2), the Government and Probation Office are simply asking the Court to apply faithfully the November 2015 Guidelines Amendments, which "reflect the Commission's conclusion that the guideline should place greater emphasis on the extent of harm that particular victims suffer as a result of the offense." U.S.S.G. App. C at 104. In short, the defendant's conduct is more serious because of the disastrous impact it had on his employer, and the 2015 amendment is designed to reflect that increased seriousness in the recommended sentencing range.

Finally, because the substantial-financial-hardship enhancement applies, the defendant is ineligible for a reduction as a zero-point offender. U.S.S.G. § 4C1.1(a)(6) (requiring, for application of reduction, that the defendant "did not personally cause substantial financial hardship.")

B. Sophisticated Means

The parties agreed in the plea agreement that two levels should be added because "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or

7

caused the conduct constituting sophisticated means," pursuant to U.S.S.G. § 2B 1.1 (b)(10)(C). *See* Plea Agreement (Doc. 107) at 4.  The Probation Office disagreed, and the defendant has reversed course and agreed with the Probation Office.  Def. Mem. at 3, n.2.

Pursuant to § 2B1.1(b)(10)(C), two levels are added "If … the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  Application Note 9 defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  The Second Circuit has identified various factors indicative of sophistication, including "the creation and use of false documents, and other tactics to conceal offense conduct," and the "repetitive and coordinated nature of [the defendant's] conduct." *United States v. Fofanah*, 765 F.3d 141, 146 (2d Cir. 2014). *See also United States v. Vacarelli*, Case No. 20-3768, 2021 WL 4805218, at *2 (2d Cir. Oct. 5, 2021) (summary order) (Affirming application of sophisticated means enhancement based on "false investment agreements" that "created a false sense of legitimacy that helped [the defendant] to convince his victims to invest their money.").  The court has further explained that sophistication can be inferred from an overall scheme, even if individual parts may not themselves be sophisticated. *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) ("even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together so that Jackson could perceive and exploit different vulnerabilities in different systems in a coordinated way."); *United States v. McCallum*, 821 F. App'x 11, 13 (2d Cir. 2020) (summary order) ("sentencing courts properly apply the sophisticated means enhancement in cases that 'involved a combination of acts, each of which standing alone was not especially complex, but which constituted sophisticated means when considered as a whole.'" (quoting *United States v. Lewis*, 93 F.3d 1075, 1081 (2d Cir. 1996)).

Here, the defendant wove together four different tactics to steal from his employer, each of which exploited a vulnerability in this start-up company, and in at least three of which he used false entries in Company A's books and records to hide his tracks. These thefts were not completed over one transaction, but over a pattern of more than 40 transactions (and, generally, corresponding ledger falsifications) from Company A's cryptocurrency wallets to multiple different wallets controlled by the defendant. In the fourth method, the defendant stole more than $100,000 from smaller Company A cryptocurrency wallets by claiming to be consolidating the "dust," or small amounts of cryptocurrency left over from other transactions, in those wallets. Collectively, this web of deception and theft enabled the defendant to steal more than $4 million from a highly sophisticated company that itself is heavily involved in the cryptocurrency marketplace. This is more than sufficient to warrant the application of the sophisticated-means enhancement.

* * *

Adding two levels for substantial financial hardship and two levels for sophisticated means, the total unadjusted offense level is 31. The parties and PSR agree that that three points should be deducted for acceptance of responsibility, resulting in a total offense level of 28. A total offense level 28, assuming a Criminal History Category I, would result in a range of 78 to 97 months of imprisonment (sentencing table) and a fine range of $25,000 to $250,000, U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 1 to 3 years. U.S.S.G. § 5D1.2.

III.    Sentencing Factors

Consideration of the Guidelines and the statutory factors in 18 U.S.C. § 3553(a)(2) demonstrate that this is a serious crime warranting a substantial term of imprisonment, even in light of the history and characteristics of this defendant, *see* 18 U.S.C. § 3553(a)(1).

A.  Seriousness of the Offense, Respect for the Law, and Just Punishment

By far the most significant consideration that calls for a substantial punishment in this case is the seriousness of the offense.  This case was not a momentary lapse in judgement, but sustained, multi-faceted scheme to steal millions of dollars from an employer that entrusted the defendant with its finances.  Several factors in particular augur for a substantial prison sentence.

*First*, the defendant's crime was borne of simple greed and selfishness, rather than an act of financial need.  The defendant was hired at a salary of $144,000 per year and was given a $50,000 bonus almost immediately.  He was single and living on his own, before he moved home to Connecticut during the course of the scheme, and thus his expenses were minimal.  Critically, however, he worked among other executives who were his contemporaries, and who were in the process of building a very successful, and potentially very lucrative, cryptocurrency business.  And, while the company invested employees in its affiliated cryptocurrency fund to allow them to share in its success, the defendant sought quicker riches than hard work and patience would afford.  His initial investment was quite clearly an attempt to make immediate, substantial gains in a very volatile market.  And while he ended up on the wrong side of a downturn in the market, and his objective turned from get-rich-quick to digging himself out of a financial hole, his motivation was in all instances to benefit himself.

*Second*, the defendant's crime is serious because of its sheer size—nearly $4.5 million in actual loss over about nine months, employing several different cons at the same time, spread over more than 40 different transactions (many of them in the hundreds of thousands of dollars), and using false ledger entries to cover up the scheme.  This was not an isolated lapse in judgment, but a sustained scheme whereby the defendant knowingly and repeatedly placed his own well being above that of his employer and his colleagues.

*Third*, as discussed above in the context of the Guidelines analysis, the defendant's theft is deserving of substantial punishment because of the profound impact it had on his employer.

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████

*Fourth*, the defendant's crime is serious because he betrayed the significant trust Company A placed in him. It is hard to fault Company A for placing the defendant in that position—he was a well-educated financial professional, a Certified Public Accountant licensed by the State of New York, and a veteran of two respected and well-known financial services firms. The defendant also understood that as a startup, staffing was necessarily thin, especially in areas that did not produce revenue—all the more reason to turn the finances over to a licensed professional. The defendant took advantage both of the confidence that came with his credentials and the lack of constant oversight a startup afforded to rob the company that trusted him. His violation of trust, in turn, ratcheted up the impact on Company A. A co-founder explained in the Victim Impact Statement that this case is painful for him because "[h]e wasn't just a colleague in my eyes – I looked at him

11

as a close friend. Someone I could depend on; someone I wanted by my side; and most of all, someone I trusted."

  B. <u>Adequate Deterrence and Protection of the Public</u>

It seems unlikely—but not impossible—that the defendant poses a meaningful risk to reoffend. At a minimum, the defendant's conviction here will make it less likely (though not impossible) that another employer would trust him in the way that Company A did. Indeed, it seems unlikely that the defendant will find an easy home as a financial professional, at least in the short term.

That said, the extent and duration of this defendant's crime points to a serious flaw in his own moral and ethical calculus that will not heal quickly, nor without significant sanction from the Court. This was not, as the defendant appears to argue, true aberrant behavior, Def. Sen. Mem. at 16. Rather, it was a series of bad choices in full view of the consequences of his actions. That he knew that his conduct was wrongful, and the impact it would have on his colleagues, makes it all the more alarming that he engaged in it anyway. To the extent that the defendant's crime was driven by addiction, it is likewise unrealistic to think that the passage of a year, a 30-day stint in rehab, and some outpatient treatment has eliminated his risk to society. Indeed, the defendant's claim that he has already "gained the skills to identify and regulate his own cognitive distortions and emotional distress," Def. Mem. at 16, in the relatively brief time since the theft, seems either wishful thinking or an admission that his distortions and distress were not as deep-seeded as he contends. In either event, the extent and duration of the defendant's fraud augurs for caution in concluding the defendant has cured the problems that led him down a criminal path.

Moreover, even if specific deterrence is not a significant consideration, the Court should strongly consider general deterrence. Fraud by organizational insiders is particularly insidious.

Organizations, particularly start-ups, must be able to delegate authority to trusted employees in order to exist, and they must be assured that society with deal seriously with violations of that trust.

      C.   History and Characteristics of the Defendant

In his sentencing memorandum, the defendant appropriately devotes a large part of his argument to various personal challenges he has faced, including drug addiction, a challenging childhood and home life, and a claimed proclivity towards gambling, as well as his moral character as evidenced by various supportive letters from friends and family. While the Government is in full agreement that these factors bear meaningful consideration in reaching the appropriate sentence, it is less clear either that they can explain away the defendant's conduct, or that they eliminate the need for a substantial prison sentence.

First, there is questionable support for the defendant's argument that his crime was largely driven by a combination of "impulsivity, compulsivity, and addictive behaviors," Def. Mem. at 10, or that it was "primarily motivated by an underlying pathology," rather than a "desire to live a lavish lifestyle," Def. Mem. at 7. The defendant's support for this contention is a psychiatric evaluation whose only diagnosis that seems in any way related to the offense of conviction is, conveniently listed at the top of a long list, a "Gambling Disorder." Report at 8. But that conclusion is entirely circular, relying on the defendant's offense conduct both as the evidence and effect of the supposed disorder. Noticeably absent is discussion of any other aspect of the defendant's life prior to, or outside of, the offense conduct that would suggest that the defendant suffered from a gambling disorder that could excuse, or even explain, his actions in this case. There is no mention of casinos, gambling apps, or even other forms of trading. In fact, the record lacks any evidence of other non-gambling impulsive or compulsive behaviors. Absent some other

13

indicator of a gambling disorder, the defendant seems no more a gambler than any other day trader, currency or commodity speculator, or cryptocurrency trader who seeks to make a quick profit by guessing the direction of a volatile market, and then tries to chase losses with more money when he guesses wrong.

The defendant's claim to the Probation Office that he "took the money with the intention of returning it eventually," and that he "never used the money for his own personal gain," PSR ¶ 23, further undermines the suggestion that the defendant's actions were borne of a compulsion to gamble or a drug-induced haze. Instead, it suggests that the defendant was operating rationally, if wrongfully—he intended to use company money to recoup his personal losses and make money for himself, and then give the company back what he took once the market went up. Such are the machinations of many fraudsters, who put others' money at risk in order to make their own fortunes. The defendant did not, as he argues, live a "lavish" lifestyle; but that is only because his investment with diverted Company A funds did not pay off. And the lavishness, or lack thereof, of the defendant's lifestyle is irrelevant in such cases, as the true seriousness of the offense comes from the havoc wrought on the victim that did not give permission for its money to be risked for the benefit of the defendant.

*Second*, while the Court ought to consider the defendant's drug addiction and childhood challenges, these do not explain or excuse his criminal conduct. *See United States v. Brady*, 417 F.3d 326, 335 (2005) ("there is sparse support in the record for a finding that Brady's impaired emotional or mental condition led her to engage in a conspiracy to commit bank fraud."). The report's suggestion that that defendant's drug use ramped up alongside his financial losses and his thefts reinforces that the original sin here—the defendant's initial attempt to strike it rich

speculating in cryptocurrency futures—was a sober decision, and that the defendant's stress and self-medication was a reaction to his increasing losses.

IV.     Responses to Defense Arguments

In addition to personal history and circumstances, as discussed above, the defendant's principal appeal for a non-Guidelines sentence is based on the oft-repeated refrain that the fraud Guidelines over-emphasize loss and are not empirically sound, and thus should be discounted. Def. Mem. at 3-7.  These arguments fail because the fraud Guidelines are, in fact, the result of careful consideration by the Sentencing Commission, and there is nothing in this case that suggests loss is an inappropriate measure of the seriousness of the crime.

*First*, contrary to the defendant's claim, the fraud Guidelines were established after long study and careful consideration.  § 2B1.1 and its loss enhancements were not the result of Congressional directive, and thus differ from the crack cocaine Guidelines criticized by the Supreme Court in *Kimbrough v. United States*, 552 U.S. 85, 109 (2007), or the child pornography Guidelines at issue in *United States v. Dorvee*, 616 F.3d 174, 183-84 (2d Cir. 2010).  Between 1996 and 2001, the Sentencing Commission gathered information, held hearings, and created an amended theft and fraud guidelines regime remedying deficiencies that had come to light in the prior version.  *See* Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35 Ind. L. Rev. 5, 7-8 (2001).  What emerged was a complete overhaul of the Guidelines' treatment of white-collar crime, including by consolidating § 2B1.1 and § 2F1.1, revising the loss table to afford higher punishments for high-loss offenders and lower punishments for low-loss offenders, and redefining the term "loss" to avoid prior ambiguity.  *Id.* at 26.  These changes were meant to respond to complaints "from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that the offenses sentenced under

15

the guidelines…*under-punish* individuals involved with moderate and high loss amounts, relative to penalty levels for offenses of similar seriousness sentenced under other guidelines." U.S.S.G. Appx. C, Am. 617 (emphasis added). Thus, the modern form of § 2B1.1 reflects the considered view of the Commission following a collaborative process with relevant stakeholders that loss amount should be a central consideration in determining the seriousness of an offense.

*Second*, reliance on *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) is misplaced. *See* Def. Mem. at 6. In *Corsey*, Judge Underhill (sitting by designation) wrote a concurring opinion to express the views that § 2B1.1 was "not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices" and its use of loss enhancements is "fundamentally flawed." *Corsey*, 723 F.3d at 377, 379. Notably, however, the Court's *per curiam* decision did not mention such policy disagreements with § 2B1.1. In fact, the Court recognized that § 2B1.1 already properly accounts for situations in which loss substantially overstates the serious of the offense—as in *Corsey*, where the enormous intended loss was never likely. *See id.* at 377 (citing U.S.S.G. § 2B1.1, Application Note 19(c)). Moreover, despite Judge Underhill's strong disagreement with the Sentencing Commission's treatment of economic crimes in § 2B1.1, he merely prescribed that "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Corsey*, 723 F.3d at 379 (concurrence). This is true in every post-*Booker* sentencing, and "[a]ssuming arguendo that some judges have chosen as a policy matter not to sentence white collar criminals to the harshest permissible punishments, this does not entitle other white-collar criminals to lighter punishments than are reasonable under the Guidelines, 18 U.S.C. § 3553(a), and the totality of the circumstances of their individual case." *United States v. Goffer*, 721 F.3d 113, 131 (2d Cir. 2013).

*Third*, there is nothing about the facts of this case that suggests loss ineffectively measures the seriousness of the crime. This is not a conspiracy in which other offenders received disproportionate amounts of the proceeds. The defendant was the sole perpetrator with criminal knowledge, and he took and disposed of all of the proceeds. Nor is this a case in which the Guidelines rely on unrealized intended loss; Company A suffered the entirety of the Guidelines loss. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

V.      Restitution and Forfeiture

The Court should order the agreed-upon restitution of $4,633,424.99 to Company A. The defendant should be afforded $69,608.00 credit against that restitution for the value of his stake in an investment fund affiliated with Company A that the defendant has returned to Company A pursuant to the plea agreement.

VI. <u>Conclusion</u>

    For the reasons stated above, the Government urges the Court to sentence the defendant to a substantial term of imprisonment commensurate with the seriousness of his crime.

                      Respectfully Submitted,

                      VANESSA ROBERTS AVERY
                      UNITED STATES ATTORNEY

                      /s/

                      DAVID E. NOVICK
                      ASSISTANT U.S. ATTORNEY
                      157 Church St., 25th Floor
                      New Haven, Connecticut 06510
                      Tel. (203) 821-3700
                      Federal Bar No. phv02874

CERTIFICATE OF SERVICE

       This is to certify that on December 10, 2024, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

       /s/

       _____
       DAVID E. NOVICK
       ASSISTANT UNITED STATES ATTORNEY